# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 19, 2012

## STATE OF TENNESSEE v. DEONTE MATTHEWS

**Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3295    Steve Dozier, Judge**

---

**No.  M2010-00647-CCA-R3-CD - Filed October 31, 2012**

---

Appellant, Deonte Matthews, was convicted by a Davidson County jury of especially aggravated robbery and the trial court sentenced Appellant to seventeen years at 100%.  After the denial of a motion for new trial, Appellant initiated this  appeal challenging the sufficiency of the evidence.  Reviewing the evidence in the light most favorable to the State, we conclude that the proof supports the conviction for especially aggravated robbery.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

DONALD P. HARRIS, SP. J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P. J., and JOHN EVERETT WILLIAMS, J. , joined.

Paul Julius Walwyn, Madison, Tennessee, for the appellant, Deonte Alesio Matthews.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Jennifer McMillen, Assistant District Attorney General, for the appellant, State of Tennessee.

## OPINION

### Factual Background

On February 26, 2008, the victim, Joseph Manna, was visiting his friend, Clarissa Plumber, at her apartment in Davidson County.  Mr. Manna had arrived at the apartment the previous night and stayed there until around 6:30 or 7:00 p.m. on February 26.  During that day, Mr. Manna and Ms. Plumber drank beer and vodka and played games on Mr. Manna's X-Box 360.  Mr. Manna brought the game console and some games to the apartment in a red duffel bag to protect them from the snow.

At some point, Mr. Manna called his roommate, Robert Sanders, to pick him up from the apartment. Mr. Manna gave Mr. Sanders general directions on how to get there and Mr. Sanders was to call when he got close so that Mr. Manna could meet him in front of the apartment complex.

While Mr. Manna was waiting for his ride, he was approached by two men and a woman. The woman, Latisha Burns, had her apartment door open and Mr. Manna was invited to come inside. Mr. Manna accepted the invitation explaining that he was cold and "way too trusting of other people." The occupant of the apartment, Ms. Burns, the Appellant, and another man, later identified by the nickname "Poker," were inside the apartment.

Once inside, the four talked for a few minutes. Mr. Manna said that he was waiting for a ride and had been playing video games all day. Appellant expressed his desire to play video games. Mr. Manna told him that his ride would be there soon but that he would call to see how far away he was. Mr. Manna phoned Mr. Sanders but did not know the exact directions for getting there and handed the phone to one of the men in the apartment. Instead of giving directions, he asked Mr. Sanders to buy them beer and cigarettes. Consequently, Mr. Manna retrieved his phone so that he could hang it up.

One of the men asked about the X-Box and started going through Mr. Manna's duffel bag. As Mr. Manna hung up the phone, he was bashed on top of the head with a gun. The gun, which appeared to be a revolver, was placed in Mr. Manna's face. One of the men started going through Mr. Manna's pockets and took his wallet, containing $200.00, and his cell phone. Mr. Manna was bleeding and overwhelmed. He asked why they were doing this to him and asked them to stop. The men told him to get out of the apartment.

Mr. Manna ran to a nearby apartment building, trying to find help. He looked back to see if he was being followed and saw the robbers standing in front of the apartment where he had been robbed. Mr. Manna began knocking on doors, and after the third attempt, a lady finally let Mr. Manna inside her apartment to use the telephone. Mr. Manna called 911. Once the police arrived, Mr. Manna was taken to the hospital.

At the hospital, Mr. Manna was in "a lot of pain." His medical records reflected that his pain was an "8" on a scale of 1 to 10. A CT scan, taken of Mr. Manna's head to rule out any fractures or closed head injuries, was negative. The wound to Mr. Manna's head was closed with four staples, and he now has a permanent scar from the injury.

The next night, Detective Paul Harris of the Metropolitan Nashville Police Department came Mr. Manna's house and showed him a series of photographs. Mr. Manna picked Appellant out of two to three dozen pictures and identified him as the man who had

gone through his pockets during the robbery in Ms. Burns' apartment. Mr. Manna also identified the Appellant at trial.

Latisha Burns, originally indicted with Appellant, testified that she had invited Mr. Manna into her apartment because he had on no coat and looked cold. Ms. Burns testified that she and the Appellant were good friends and that he had been to her apartment approximately 50 times. On the evening of the robbery, the Appellant was accompanied by a man nicknamed "Poker," whom the Appellant described as a "friend." Ms. Burns testified that Appellant and "Poker" approached her in the kitchen of her apartment and told her that they were going to take Mr. Manna's "stuff." Ms. Burns stated that both men were "in on it."

Ms. Burns witnessed the robbery. "Poker" hit Mr. Manna in the head with the handle of the gun and held him at gunpoint during the robbery. Appellant went through Mr. Manna's pockets and duffel bag. The men left with the stolen items. Appellant promised Ms. Burns he would give her some money once the stolen items had been pawned because the robbery had taken place in her apartment and in return for not identifying him as having committed the robbery. Ms. Burns testified that she was afraid to tell authorities and lied about it when initially questioned. She subsequently identified Appellant from a photograph prior to the trial.

A tape recording of a jailhouse telephone conversation was introduced at trial. The conversation took place between Appellant and "Poker." During the conversation, Appellant stated that he was "the one that went in his pocket and took the wallet."

Appellant testified at trial and admitted that he was at Ms. Burns's apartment the day of the robbery, drinking vodka. Appellant stated that he had only known "Poker" for a few weeks because Poker had just gotten out of the penitentiary. Appellant testified that he felt pressured to go through Mr. Manna's pockets because "Poker" had a gun. Appellant claimed that Ms. Burns was lying when she testified that the two men discussed the robbery in the kitchen and described the incident as a spur of the moment event. Appellant testified that he received none of the proceeds of the robbery; that "Poker" took everything. Appellant also claimed that Ms. Burns had mental problems.

At the conclusion of the proof, the jury found Appellant guilty of especially aggravated robbery as charged in the indictment. After a sentencing hearing, the trial court imposed a sentence of seventeen years. Subsequently, Appellant filed a motion for new trial. The trial court denied the motion, and Appellant filed a timely notice of appeal.

*Analysis*

On appeal, Appellant challenges the sufficiency of the evidence. Specifically, Appellant argues that the evidence does not show that the victim suffered serious bodily injury such that the conviction rose to the level of "especially" aggravated robbery. The State disagrees.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. *Id.* Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In order to support Appellant's especially aggravated robbery conviction, the State had the burden at trial of introducing evidence to support each element of the offense. Especially aggravated robbery is defined as a robbery "[a]ccomplished with a deadly weapon" where "the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a)(1)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). A "deadly weapon" is defined, in relevant part, as a "firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or seriously bodily injury." *Id.* § 39-11-106(a)(5). Tennessee Code Annotated section 39-11-106 (a)(34) defines serious bodily injury as follows:

"Serious bodily injury" means bodily injury that involves (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is eight years of age or less.

*Id.* at (34).

In this case, Appellant asserts the evidence introduced at trial was insufficient to support his conviction because the proof failed to establish that the victim suffered serious bodily injury, an essential element of especially aggravated robbery. *See id.* § 39-13-403(a)(1)-(2). The victim testified at trial about the extent and severity of his injury. He testified that after being hit in the head with the handle of the gun, he experienced significant pain, rating that pain as an eight on a scale of one to ten. The victim's injury required him to have four staples put in his head to close the wound. As a result of his injury, the victim had a permanent scar on his head. We note that this witness's testimony has been accredited by the Appellant's guilty verdict. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). When confronted with the issue of whether a permanent scar is sufficient for a jury to find "protracted or obvious disfigurement" as described in Tennessee Code Annotated section 39-11-106(34), this court has consistently determined that it is. In *State v. Anthony D. Forster*, No. M2002–0008–CCA–R3–CD (Tenn. Crim. App. April 12, 2011) perm. app. denied (Tenn. Aug. 24, 2011), this court held a dimming facial scar 'running from the middle of the bridge of her nose down to her lip area" sufficient to establish "protracted or obvious disfigurement" as included in the definition of serious bodily injury. *Id.* at *10. Similarly, in *State v. Shanda Alene Wright*, No. M2006-02343-CCA-R3-CD, 2006 (Tenn. Crim. App. Feb. 11, 2008) perm. app. denied (Tenn. Oct. 27, 2008), the victim was struck on the head with a pistol resulting in a scalp wound that required five stitches to close and leaving a permanent scar. The victim was also cut on the arm which left a scar three centimeters in length. This court held these scars to be sufficient evidence upon which a jury could determine there was "protracted or obvious disfigurement" and, thus, serious bodily injury. *Id.* at *7. In *State v. Clay B. Sullivan*, M2004-03068-CCA-R3-CD (Tenn. Crim. App. March 10, 2006) this court held that a "two-inch scar was sufficient for the jury to find protracted and obvious disfigurement." *Id.* at *8. In *State v. Mario Merritt*, No. W2003-02868-CCA-R3-CD, (Tenn. Crim. App., at Jackson, Nov. 30, 2004), perm. app. denied (Tenn. Feb. 28, 2005) this court held that a gunshot wound to the shoulder requiring medical treatment, leaving a scar, and continuing to cause intermittent pain was a serious bodily injury. Id. at *4. This court's consistent determination that a permanent scar is sufficient evidence on which a jury may base a finding of protracted or obvious disfigurement and serious bodily injury foretells our conclusion here. We conclude, therefore,

that the State introduced sufficient evidence to support a finding beyond a reasonable doubt that the victim suffered serious bodily injury. This issue lacks merit.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
DONALD P. HARRIS, SPECIAL JUDGE